**EXHIBIT E**

AGREEMENT OF SALE

This Agreement of Sale ("Agreement") is made as of January __, 2022 (the "Effective Date") by and among BCR PINEWOOD REALTY LLC, a New Jersey limited liability company (the "Seller"), BR LAKEWOOD LLC, a Delaware limited liability company ("BR Owner"), CR LAKEWOOD LLC, a Delaware limited liability company ("CR Owner" and, together with Seller and BR Owner, collectively, the "Seller Parties" and each a "Seller Party") and RUSHMORE CAPITAL L.L.C., a New Jersey limited liability company ("Purchaser").

1A. BR Owner and CR Owner are the sole direct or indirect owners of one hundred percent of the membership interests of Seller. Seller is the current owner of the Property (as hereinafter defined). Prior to the Closing (as hereinafter defined), in accordance with the terms of this Agreement, Seller shall form PINEWOOD I LLC, a New Jersey limited liability company ("New Propco 1") and PINEWOOD II LLC, a New Jersey limited liability company ("New Propco 2" and, together with New Propco 1, "New Propco"), so that, upon formation, Seller shall own one hundred percent (100%) of the limited liability company interests in New Propco (the "Interests"). Prior to Closing, (i) Seller shall transfer and convey its interest in the Property to each New Propco, each as a fifty percent (50%) tenants in common, for no or nominal consideration pursuant to a New Jersey bargain and sale deed with covenant against grantor's acts (the "Deed"), and a contribution agreement, the form of which is to be agreed upon by Purchaser and Seller prior to Closing (the "CO Contribution Agreement") and (ii) distribute (x) Seller's ownership interest in New Propco 1 to BR Owner and Seller's ownership Interest in New Propco 2 to CR Owner. The conveyance by Seller to New Propco is referred to herein as the "Propco Conveyance". Accordingly, prior to conveyance of the Interests to Purchaser, (x) New Propco 1 and New Propco 2 will be the sole fee owner of the Property and (y) BR Owner will be the sole owner of New Propco 1 and CR Owner will be the sole owner of New Propco 2.

1. Definitions. As used in this Agreement, the following capitalized terms shall have the meanings indicated below:

(a) "Escrow Agent" means Madison Title Agency, LLC.

(b) "Property" or "Premises" means the real estate located at 1703 Lexington Avenue, a/k/a 1609-15 Monmouth Avenue, Lakewood, Ocean County, New Jersey as described in Exhibit A; together with (i) all improvements, rights, approvals, and easements benefitting such Property; (ii) all right, title and interest of Seller, if any, in and to the fixtures, furniture, equipment and other personal property (the "Personal Property") attached or appurtenant to the improvements upon the Property; (iii) all right, title and interest of Seller in and to Leases and Service Contracts, and (iv) all of Seller's rights to any existing security deposits, pet deposits, and other refundable tenant deposits (collectively, the "Tenant Deposits") relating to the Leases.

(c) "Leases" means the residential lease agreements for the Property as set forth in the rent roll attached in Exhibit B.

(d) "Service Contracts" means the service, maintenance, supply, equipment, rental and other contracts affecting the Property as set forth in Exhibit C.

2. Sale And Purchase.
Subject to the terms of this Agreement, Seller Parties shall sell (or cause the sale) to Purchaser, and Purchaser shall purchase from Seller, at the Purchase Price (as defined below) and upon the terms and

conditions set forth in this Agreement, all of the Interests in New Propco, free and clear of all liens, claims encumbrances, pledges, options, warrants, calls, commitments, charges and judgments whatsoever.

      3.     Purchase Price. The purchase price for the Interests shall be the sum of Forty-Seven Million One Hundred Thousand Dollars ($47,100,000.00) (the "Purchase Price"). Purchaser shall pay a deposit in the sum of Two Million Five Hundred Thousand Dollars ($2,500,000.00) (the "Initial Deposit") to the Escrow Agent within one (1) business day following the Effective Date. The Escrow Agent shall hold and disburse the Initial Deposit and, if applicable, the Additional Deposit in accordance with the terms of this Agreement. The Initial Deposit and Additional Deposit shall be collectively referred to as the "Deposit," which shall be credited against the Purchase Price at the Closing. The balance of the Purchase Price (subject to Closing adjustments) shall be paid at the Closing by wire transfer of immediately available funds.

      4.     Closing. The Closing ("Closing") shall occur sixty (60) calendar days after the Effective Date (the "Closing Date"). The Closing shall occur by escrow with the Escrow Agent, whereby the parties place all closing documents and funds into escrow with the Escrow Agent who shall release same upon completion of the Closing. Purchaser may extend the Closing Date for up to thirty (30) calendar days upon written notice to Seller given no later than fifty (50) calendar days after the Effective Date and payment of an additional deposit to the Escrow Agent in the sum of Five Hundred Thousand Dollars ($500,000.00) (the "Additional Deposit").

      5.     Title. Title to the Premises shall be good and marketable, and insurable at regular rates, by any reputable title insurance company licensed to do business in the State of New Jersey, subject only to the Permitted Exceptions. The "Permitted Exceptions" shall mean: (i) utility easements for services to the Property; (ii) such state of facts as may be shown on an accurate survey not objected to by Purchaser pursuant to this provision; (iii) all present and future zoning ordinances and other governmental regulations, specifically excluding current zoning or buildingcode violations; (iv) the standard printed exclusions in the form of an owner's title insurance policy; (v) all presently existing and future liens for unpaid real estate taxes and water and sewer charges not due and payable as of the Closing Date, subject to adjustment as provided herein; (vi) minor encroachments, if any, upon the Property of walls, foundations or appurtenances of buildings located on adjoining premises as well as minor encroachments, if any, of building walls, foundations or appurtenances belonging to the Property upon adjoining premises; (vii) the Leases; and (viii) any lien, encumbrance or other matter affecting title to the Property arising out of the acts or omissions of Purchaser or any Purchaser related party. Purchaser shall order, at its sole cost and expense, a title commitment for the Premises (the "Title Commitment") from a reputable title insurance company licensed to do business in the State of New Jersey (the "Title Company"). Purchaser may, but shall not be obligated, to obtain a current ALTA survey of the Property (the "Survey"). Purchaser shall cause the Survey and Title Commitment, together with all title exceptions referred to therein, to be delivered promptly, but no later than twenty (20) days from the Effective Date (the "Title Review Period"). If the Premises do not comply with the quality of title provision contained herein, then Purchaser shall notify Seller in writing prior to the expiration of the Title Review Period (the "Title Objection Notice") of the title defect(s) to which Purchaser objects (the "Objectionable Title Matters") and Seller will be given until the Closing Date to render title insurable and in compliance herewith. Seller shall not be required to institute a legal proceeding or action to render title insurable or in compliance, provided, however, that Seller shall be required to cause the release of any mortgage, mechanics lien, judgment, or other monetary lien placed on the Property. Seller shall send a written notice to Purchaser within ten (10) days of receipt of Purchaser's Title Objection Notice, advising Purchaser whether it is electing to (i) attempt to remove any Objectionable Title Matters, or (ii) choosing not to remove any Objectionable Title Matters, in which event Purchasershall have the rights set forth in the last sentence of this paragraph. If Seller fails to

send the written notice provided for in the prior sentence, Seller shall have been deemed to have chosen not to attempt to remove any Objectionable Title Matters. In addition, if Seller has elected to proceed under (i) above, but Seller cannot cure the defect in title, then, Purchaser may as its sole remedy elect to either (x) terminate this Agreement by written notice to Seller, in which event this Agreement shall terminate and be of no force and effect, or (y) to waive any defect of Seller's title and proceed to Closing without abatement or diminution of the Purchase Price. If, on the Closing Date, there are any liens or encumbrances that Seller is obligated to discharge under this Agreement, Seller shall either (i) arrange, at Seller's cost and expense, for affirmative title insurance or special endorsements insuring against loss or damage resulting from enforcement of such liens or encumbrances against, or collection of the same out of, the Property, and/or (ii) use any portion of the Purchase Price to pay and discharge the same, either by way of payment or by alternative manner reasonably satisfactory to the Title Company, including, without limitation, escrow or bond over same. In the event the Title Company revises or updates the Title Commitment (each a "Title Update") after the expiration of the Title Review Period or Purchaser receives revisions or updates to the Survey (each a "Survey Update") after the expiration of the Title Review Period, Purchaser shall have the right to object to any matter first raised by the Title Update or Survey Update that are objectionable to Purchaser, by giving written notice to Seller of such objectionable matters within five (5) business days from the date of its receipt of such Title Update or Survey Update. If Purchaser timely disapproves any such matter, it shall constitute further Objectionable Title Matters and be subject to the same procedures set forth above.

6. No Due Diligence.

(A) Purchaser acknowledges and agrees that this Agreement is **not** subject to any due diligence or inspection contingency. Purchaser has inspected the Property, reviewed the Leases and other financial information concerning the Property, and has performed such other due diligence it deems necessary prior to executing this Agreement. Purchaser hereby represents that it is fully familiar and satisfied with the physical, environmental and financial condition of the Property.

(B) Seller shall, from time to time, upon not less than 48 hours written notice from Purchaser, provide (or make available to Purchaser for review) Purchaser such, books, records, documents and other information related to the Property which are reasonably requested by Purchaser, provided, however, that Seller shall not be required to make available any appraisals or communications to investors or other internal confidential information. Purchaser, and Purchaser's agents and representatives, shall have the right, from time to time, prior to the Closing or earlier termination of this Agreement, during normal business hours and upon not less than 48 hours written notice from Purchaser, to enter upon the Property for the purpose of conducting visual inspections of the Property, testing of machinery and equipment, taking of measurements, making of such investigations as surveys, appraisals, underwriting analyses and any investigations regarding the Property, including reviewing contracts, Leases and the books and records relating to the Property and conducting a so-called phase I environmental site assessment ("Phase 1"), physical conditions report and other inspections of the Property; provided, however, that Purchaser shall give Seller not less than 48 hours' prior written notice of the time and place of such entry; (ii) not materially interfere with the operations of the Property or any tenant thereof; (iii) restore any damage to the Property or any adjacent property caused by such actions; (iv) indemnify, defend and save Seller Parties and, as the case may be, its partners, trustees, shareholders, directors, members, officers, employees and agents harmless of and from any and all claims and/or liabilities which Seller Parties and its partners, trustees, shareholders, directors, members, officers, employees and agents may suffer or be subject by reason of or in any manner relating to such entry and such activities, including, without limitation, any claims by tenants and/or invitees of the Property; (v) not enter into any tenant's leased space or communicate with any tenant unless Seller gives Purchaser written consent to do so (which consent may be withheld at Seller's sole option) and Purchaser is accompanied

4840-1508-6840, v. 1

by Seller or Seller's agent or representative in each instance; (vi) prior to entry onto the Property, furnish Seller with a certificate of general liability and property damage insurance maintained by Purchaser with single occurrence coverage of at least $1,000,000 (and aggregate coverage of $2,000,000) and naming Seller and its property manager as additional insureds; and (vii) not conduct any Phase II or physically invasive environmental investigations or testing nor permit an LSRP to visit the Property or conduct any testing or otherwise be involved in the environmental assessment. Purchaser and its agents shall at all times be accompanied by a representative of the Broker. All inspection rights under this Section shall be subject to the rights of tenants under the Leases. The foregoing and the results thereof are not intended to, and shall not impair or modify Section 6(A) above, grant Purchaser any right to, terminate or modify this Agreement, or entitle Purchaser to any abatement or offset against the Purchase Price.

(C) Purchaser acknowledges and agrees that Seller shall sell and convey to Purchaser, and Purchaser shall accept the Interests and, indirectly, the Property from Seller on an "AS IS", "WHERE IS" basis. Seller makes no representations except for those expressly provided in this Agreement and the documents delivered at Closing and authorizes no other persons, including any third parties or representatives or agents of Seller, to make any representations whatsoever concerning the Property. Purchaser acknowledges that, except as expressly provided in this Agreement and in the Closing documents, no such representations have been made and that Purchaser has not relied and will not rely on, and Seller is not liable for or bound by, any express or implied warranties, guaranties, statements, representations or information pertaining to the Property or the development thereof. Purchaser acknowledges that it has solely relied upon its own inspections, audits and investigations in connection with the purchase of the Property. Purchaser and all of Purchaser's successors and assigns accept the condition of the Property as-is and with all faults; and waive any and all claims against Seller and all Seller's officers, directors, employees, agents, owners pursuant to the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C.A. § 9601 et seq., the Resource Conservation and Recovery Act (RCRA), 42 U.S.C.A. § 6901 et seq., the Clean Water Act (CWA), 33 U.S.C.A. § 1251, the New Jersey Spill Compensation and Control Act, N.J.S.A. 58:10-23.11 et seq., and/or any and all other environmental laws regardless of whether pursuant to statute and/or common law. This provision shall survive the Closing.

(D) On or before the expiration of the Title Review Period, Purchaser shall notify Seller of the Service Contracts to be terminated as of Closing and, provided that such Service Contracts can be terminated without any cost to Seller, Seller shall cause the same to be terminated as of the Closing Date. Any Service Contract which Seller is not required to terminate under this provision shall be assigned to, and assumed by, New Propco at Closing.

(E) (i) Not less than thirty (30) days nor more than forty (40) days prior to Closing, Seller shall cause each New Propco to be duly formed in the State of New Jersey. Seller shall prepare an initial operating agreement for New Propco, which shall be considered and treated as a disregarded entity for tax purposes and Seller shall not be required to obtain tax identification numbers for New Propco.

(ii) Seller and Purchaser acknowledge and agree that Purchaser shall take ownership of the Interests free and clear of any pledge, mortgage, hypothecation, assignment, encumbrance, right of first refusal, right of first offer, option to purchase, warrant, repurchase right or other pre-emptive right, lien (statutory or other), charge or other security interest, preference, subscription, call right, priority or other security agreement, agreement giving any person the right to purchase, subscribe for or otherwise receive or be issued any equity interests, or other preferential arrangement of any kind or nature, in each case, to the extent currently effective, effective at a future date, authorized, issued or reserved for issuance (each, a "Lien", and collectively, "Liens"). If, at any time prior to the Closing, Purchaser learns of the existence of any Liens, then Purchaser shall give written notice thereof to Seller and Seller shall cause such Lien to be satisfied on or prior to the Closing Date.

4840-1508-6840, v. 1

(iii)  Seller shall provide a draft of the Deed, together with the applicable Seller's Residency Certificate and a Seller's Affidavit of Consideration (collectively, "Transfer Tax Forms") to Purchaser for review not less than ten (10) days prior to Closing. Not less than two (2) Business Days prior to the Closing Date, Seller shall utilize the Title Company to cause the Deed and Transfer Tax Forms to be recorded with the appropriate recorder's office in Ocean County, New Jersey.

7.  Documents To Be Delivered By Seller At Closing. At or prior to the Closing, Seller Parties shall deliver to Purchaser the following documents (with each Seller Party, as applicable, executing on behalf of New Propco):

(i)  an Assignment of Interest with respect to the Interests, in the form attached hereto as Exhibit D (the "Assignment of Interests") conveying the Interests to Purchaser, together with local and state conveyance tax statements, if required;

(ii)  A customary title affidavit;

(iii)  A closing statement showing the applicable closing adjustments;

(iv)  1099 and FIRPTA affidavit;

(v)  Certification restating Seller's Parties representations set forth in Section 10.

(vi)  Resolutions authorizing the Propco Conveyance and the sale of the Interests.

(vii)  Rent roll and Tenant Deposits schedule for the Property;

(viii)  Attornment letters to the tenants;

(vi)  Assignment and assumption of the lease agreements in the form attached as Exhibit E (the "Lease Assignment") between Seller and New Propco;

(ix)  Assignment and assumption of the Service Contracts Purchaser shall assume pursuant to Section 6(C), in customary form (the "Service Contract Assignment");

(x)  Bill of sale for the Personal Property;

(xi)  An Order of Dismissal with Prejudice or Stipulation Of Dismissal With Prejudice with respect to any claims in litigation affecting the ability to transfer or clear title to the Property and the discharge of any lis pendens with respect to the litigation regarding or affecting the Property filed by any of the Seller Related Parties, including, without limitation, the litigation filed under Docket No. OCN-C-000127-15 and Docket No. OCN-C-000152-16 (collectively, the "Lawsuit"), however, the monetary claims between the Seller Parties (relating to the Seller's period of ownership of the Property and other matters which do not relate to the Property) which, in any event, do not, will not and cannot affect title to the Property, need not be dismissed; and

(xii)  Other documents reasonably requested by Purchaser's title insurance company or required by the terms of this Agreement.

8.  **Documents to be Delivered by Purchaser at Closing.** At the Closing, Purchaser shall execute and deliver to Seller:

   (i)  A counterpart of the closing statement showing the applicable closing adjustments.

   (ii) Resolutions authorizing the purchase of the Interests.

9.  **Adjustments.**

   (A)  At the Closing, Purchaser and Seller shall adjust for real estate taxes, personal property and ad valorem taxes and assessments, utility charges, and municipal water and sewer charges for the Property. All adjustments pursuant to this Section shall be calculated as of 11:59 p.m. on the day prior to the date of the Closing, with Seller be responsible for all such costs related to the period prior to Closing and Purchaser responsible for all such costs from and after the date of Closing.

   (B)  Seller or Purchaser, as the case may be, shall receive a credit for regular charges under any Service Contracts paid and applicable to Purchaser's period of ownership or payable and applicable to Seller's period of ownership, respectively.

   (C)  At Closing, Purchaser shall receive a credit in the amount of the Tenant Deposits.

   (D)  All rent payments collected in the month of Closing under the Leases shall be prorated as between the parties as of the Closing. Purchaser shall receive a credit for all prepaid rents. All rent collected after Closing under the Leases for any period prior to Closing shall belong to Seller and, if paid to Purchaser, subject to the provisions of the following sentence, Purchaser shall promptly send such rent to Seller. All rent collected after Closing shall be applied first to current rent payments due and owing and then to pay any arrearages (in inverse order/most recent arrearages paid first). If rents or any portion thereof are received by Seller after the Closing, Seller shall promptly turn over such amounts to Purchaser, to be applied by Purchaser in accordance with the allocation set forth above. (D) Any error in the calculation of closing adjustments shall be corrected after the Closing with appropriate credits to be given based upon verified information; provided, however, that the adjustments (except if errors are caused by misrepresentation) shall be adjusted and thereafter deemed final no later than the ninetieth (90th) day after Closing.

   (E)  Purchaser shall pay (i) the fees of any counsel representing Purchaser in connection with this transaction, (ii) any costs associated with any financing that Purchaser may obtain (including, but not limited to, transfer or documentary stamp taxes and non-recurring intangible taxes in connection therewith, if applicable, and the cost of lender's title insurance policy), and (iii) the so-called "mansion tax" if applicable. Seller shall pay the realty transfer fee. Any other costs or expenses incident to this transaction and the closing thereof not expressly provided for above shall be allocated between and paid by the parties in accordance with custom and practice in the State of New Jersey.

10. **Seller Representations.** Each Seller Party represents to the best of its knowledge as follows:

   (A)  Seller is a New Jersey limited liability company in good standing under the laws of New Jersey and each of BR Owner and CR Owner is a Delaware limited liability company in good standing under the laws of Delaware. Each Seller Party is duly authorized, has full power and authority under all applicable laws and all agreements to which it is a party or by which it is bound, to enter into this Agreement and perform all of the terms and conditions and covenants set forth herein.

4840-1508-6840, v. 1

(B)  Except for the Lawsuit, there are no actions, suits or proceedings pending or, to the actual knowledge of each Seller Party, threatened that could have a material adverse effect against Seller Party or the Property.

(C)  No Seller Party is a "foreign person" within the meaning of Section 1445(f)(3) of the Internal Revenue Code of 1986, as amended, and the related Treasury Department regulations.

(D)  No Seller Party has received any written notice of violation of any federal, state or municipal law or ordinance affecting the Property which remains uncured.

(E)  No Seller Party has received written notice of any pending or threatened condemnation of the Property.

(F)  The execution and delivery of this Agreement and the performance and compliance with the terms hereof by each Seller Party will not conflict with or result in the breach of any of the terms, conditions or provisions of, or constitute a default under any other agreement or instrument, or any order, law, rule, regulation, judgment or decree to which any Seller Party is a party to or by which any Seller Party is bound.

(G)  No Seller Party nor any of their respective officers, directors, or shareholders (a) is listed on the Specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Asset Control, Department of the Treasury ("OFAC") pursuant to Executive Order No. 13224, 66 Fed. Reg. 49079 (September 25, 2001) (the "Order"); (b) is listed on any other list of terrorists or terrorist organizations maintained pursuant to the Order, the rules and regulations of OFAC or any other applicable requirements contained in any enabling legislation or other Executive Orders in respect of the Order (the Order and such other rules, regulations, legislation or orders are collectively called the "Orders"); (c) is engaged in activities prohibited in the Order; or (d) has been convicted, pleaded nolo contendere, indicted, arraigned or custodially detained on charges involving money laundering or predicate crimes to money laundering.

(H)  The rent roll (the "Rent Roll") attached as Exhibit B is a true and complete copy of the rent roll for the Property as of the date thereof. The Rent Roll adequately discloses all Leases affecting the Property. Seller has made available to Purchaser at the Property for review copies of each of the Leases (including all guaranties, amendments, renewals, modifications and all other documents of any kind affecting the Leases) in Seller's possession or control prior to the Effective Date. There are no leasing commissions or fees which are or may become due and payable with respect to any of the Leases.

(I)  There are no employees who are employed by Seller whom Purchaser will be obligated to employ or compensate. On and after the Closing, Purchaser will have no obligations concerning any pre-Closing employees of Seller unless retained by Purchaser. Seller is not party to any union contract.

(J)  There are no service, maintenance, supply, equipment, rental and/or other contracts affecting the Premises, except for the Service Contracts set forth on Exhibit C attached hereto.

(K)  Each New Propco has all necessary limited liability company, as applicable, power and authority to own its assets and to carry on its respective business as the same has been conducted. No person has any voting or management rights with respect to either New Propco other than the applicable Seller Parties.

4840-1508-6840, v. 1

The representations of Seller Parties shall be true and correct in all material respects on the date hereof and as of the Closing Date, subject to an updated Rent Roll. The representations of the Seller Parties shall not survive the Closing.

11. Purchaser's Representations. Purchaser represents as follows, which representations shall be true and correct as of the Closing:

(A) Purchaser is duly authorized to enter into this Agreement.

(B) There are no actions, suits or proceedings pending or, to Purchaser's actual knowledge, threatened that could have a material adverse effect against the Purchaser.

(C) Purchaser is not a "foreign person" within the meaning of Section 1445(f)(3) of the Internal Revenue Code of 1986, as amended, and the related Treasury Department regulations.

(D) Neither Purchaser nor any of its officers, directors, or shareholders (a) is listed on the Specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Asset Control, Department of the Treasury ("OFAC") pursuant to Executive Order No. 13224, 66 Fed. Reg. 49079 (September 25, 2001) (the "Order"); (b) is listed on any other list of terrorists or terrorist organizations maintained pursuant to the Order, the rules and regulations of OFAC or any other applicable requirements contained in any enabling legislation or other Executive Orders in respect of the Order (the Order and such other rules, regulations, legislation or orders are collectively called the "Orders"); (c) is engaged in activities prohibited in the Order; or (d) has been convicted, pleaded nolo contendere, indicted, arraigned or custodially detained on charges involving money laundering or predicate crimes to money laundering.

(E) Purchaser has sufficient funds available to pay the Purchase Price at the Closing.

12. Condemnation. If a condemnation proceeding is instituted against all or any portion of the Property prior to Closing, Purchaser shall have the right as its sole remedy to either (i) terminate this Agreement and be refunded the Deposit; or (ii) take an assignment at Closing of all of Seller's right to receive any condemnation award together with all of Seller's rights to litigate such claim and to negotiate a settlement with the condemning authority.

13. Casualty. Seller shall bear the risk of loss to the Property until the Closing. If there is a casualty to any portion of the Property, Seller shall promptly notify Purchaser thereof. If the cost of repairing the casualty is reasonably expected to be in excess of Two Million Five Hundred Thousand Dollars ($2,500,000.00), then Purchaser shall have the right to terminate this Agreement and be refunded the Deposit in which event there shall be no further liability or obligation on either of the parties hereto and this Agreement shall become null and void, except as specifically provided. If this Agreement shall not be terminated by Purchaser, then Seller shall assign and turn over to Purchaser the insurance proceeds received and shall assign to Purchaser at Closing of all of Seller's right to receive any insurance proceeds together with all of Seller's rights to litigate such claim and to negotiate a settlement with the insurance carrier, and Purchaser shall receive a credit for the amount of the deductible under such insurance policy.

14. Brokers. Each Seller Party and Purchaser each represents and warrants to the other that it has not dealt with any broker, finder or similar agent in connection with the transaction contemplated by this Agreement, and that it has not taken any action which would result in any broker's, finder's or other fee or commission being due or payable to any party other than Gebroe Hammer Associates ("Broker"). Seller shall be responsible to pay the Broker a commission at the Closing pursuant to a separate agreement between them. Each Seller Party and Purchaser shall indemnify and hold harmless the other

against any and all liability, loss and expense (including reasonable attorney's fees) resulting from a breach of this representation and warranty of the indemnifying party. The Broker shall not have a lien on the Property on account of its anticipated commission. The provisions of this Section shall survive the Closing or earlier termination of this Agreement.

15. <u>Seller Covenants</u>. Following the execution of this Agreement and before the Closing, Seller Parties hereby covenant and agree as follows:

(a) Seller shall not grant any rent credits under the Leases for any time period beyond the Closing. Seller shall not accept any prepayment of rent for more than one month beyond the Closing Date.

(b) Any apartments which become due for renewal from the Effective Date and any re-rentals of apartment units shall be rented in accordance with the same standards currently employed by Seller, provided, however, that any such leases shall be made at market rents and for a term of not greater than one (1) year, and Seller shall make available at the rental office to Purchaser copies of any new leases or renewals of leases.

(c) Prior to Closing, Seller shall protect and preserve the Property by causing the customary services to be provided for the Property based on Seller's historical practice, in compliance with all laws, and causing the Property to be operated in the ordinary course of business. Additionally, Seller (i) shall pay, in the normal course of business and in any event prior to Closing, sums properly due for work, materials or services furnished or otherwise incurred by or at the request of Seller in connection with the ownership and operation of the Property to the Closing Date; and (ii) shall not remove any of the Personal Property unless it replaces the same with personal property of equal or superior quality.

(d) Seller shall maintain all casualty and liability insurance in place as of the Effective Date with respect to the Property in amounts and with deductibles substantially the same as of the Effective Date.

(e) Prior to the Closing Date, Seller shall terminate all Service Contracts which Purchaser has not affirmatively elected to have New Propco assume by written notice given to Seller not later than thirty (30) days prior to Closing. Seller shall not, other than in connection with an emergency or casualty, enter into any new Service Contracts or modifications, renewals or terminations of any existing Service Contracts which is not terminable upon thirty days' notice, without the written consent of Purchaser, which consent shall not be unreasonably withheld, conditioned or delayed. If Seller enters into any new Service Contracts or modifications, renewals or terminations of any existing Service Contracts, in in accordance with this Section, Seller shall provide Purchaser with a true, correct and complete copy of the same. Seller shall also terminate any property management agreement or brokerage/leasing agreements affecting the Property as of the Closing Date.

(f) Seller shall deliver written notice to Purchaser of: (i) the commencement of any action or proceeding against Seller or the Property of which Seller has written notice, (ii) Seller's receipt of written notice that either Seller or the Property is in material violation of any applicable laws, or (iv) Seller's receipt of written notice of any material default by Seller under any of the Leases.

(g) If any federal, state or local municipality or government body (collectively, the "Municipality") requires the issuance of a certificate of occupancy, certificate of code compliance, or other inspection certificate, or other governmental approvals are required by any federal, state, county, or local governmental authority or agency before the Property may be transferred by Seller to New Propco or other like certificate to transfer the ownership of the Property to New Propco (in each case, a "Certificate"), it is the obligation of Seller to apply for and obtain such Certificate prior to the scheduled Closing Date. The cost and expense of the inspections shall be borne solely by Seller; provided, however, Seller shall not be obligated to spend more than Ten Thousand Dollars ($10,000.00). If the cost of the work required to obtain the Certificate exceeds $10,000.00, then Seller shall promptly provide written notice to Purchaser of such determination and, upon receipt of such notice, Purchaser shall either, elect to (i) reimburse Seller at Closing for the actual excess cost incurred by Seller in obtaining the Certificate (in which event Seller shall be obligated to obtain the Certificate prior to the Closing Date), or (ii) terminate this Agreement by written notice to Seller, in which event this Agreement shall terminate and be of no force and effect. Any DCA inspection of the Property required under applicable regulations shall be performed by Purchaser after the Closing and Purchaser shall be solely responsible for making any required repairs.

(h) New Propco Covenants. Except as otherwise set forth in or contemplated by this Agreement, Seller Parties shall not, and shall not permit New Propco to:

(1) sell, exchange, assign, transfer, convey or otherwise dispose of or cause the same to occur of all or any part of the Property, the Interests or any other asset of New Propco;

(2) acquire or agree to acquire any shares or other interest in any company, partnership or other venture;

(3) transfer, pledge, encumber (including by way of any Lien), convey, devise, or sell the Interests;

(4) sell, pledge, transfer, dispose of, assign, encumber, create, allot or issue, or grant an option to subscribe for, any share capital of or any interest in Seller or New Propco or any rights with respect thereto, any security convertible into or representing a right to acquire such shares of New Propco or enter into any agreement, call or commitment of any character that would obligate it to do any of the foregoing;

(5) merge or consolidate New Propco with any other person or entity, or adopt a plan of complete or partial liquidation, dissolution, restructuring, recapitalization or other reorganization of New Propco;

(6) incur any indebtedness for borrowed money or enter into any swap or other off-balance transactions or assume, guaranty, endorse or otherwise as an accommodation become responsible for the obligations of any other person or entity, (ii) make any loans, advances or capital contributions to, or investments in any other person or entity, or (iii) forgive any indebtedness for borrowed money, except, in each case, if the same is fully repaid, terminated and discharged at Closing; or

(7) file a voluntary petition for bankruptcy.

16. <u>Default</u>. Upon an uncured default by Seller hereunder, Purchaser's sole and exclusive remedy shall be either to (i) terminate this Agreement and be refunded the Initial Deposit and the Additional Deposit, in which event Seller shall reimburse Purchaser for all out of pocket costs and expenses, including, without limitation, reasonable attorneys' fees and court costs, incurred by Purchaser in connection with the transaction contemplated by this Agreement in an amount not to exceed Twenty Five Thousand Dollars ($25,000.00), or (ii) sue for specific performance (such election must be made, and such action for specific performance, must be commenced within thirty (30) days from the date of the occurrence of Seller's alleged default). Purchaser expressly waives any rights it may have to sue Seller for consequential or other damages. Upon an uncured default by Purchaser hereunder, Seller's sole remedy shall be to terminate this Agreement and retain the Deposit and Additional Deposit as liquidated damages. The parties agree that Seller's retention of the Deposit and Additional Deposit as liquidated damages is not intended as a penalty but rather constitutes fair consideration for Seller's loss of the sale of the Property and for having removed the Property from the market during the terms of this Agreement. If litigation is commenced to enforce any of the provisions of this Agreement, the prevailing party, in addition to any other remedy permitted under this Agreement, shall also be entitled to an award of reasonable legal fees and costs. Notwithstanding the foregoing, in the event either BR Owner or CR Owner willfully and intentionally refuses to (x) cause Seller to convey the Property to New Propco and/or (y) convey the Interests to Purchaser by the closing Date (such refusing party, if any, is referred to herein as, a "Non-Complying Seller Party"; and such non-refusing party, if any, is referred to herein as a "Complying Seller Party"), Purchaser shall be afforded all rights and remedies available at law and in equity against the Non-Complying Seller Party, provided that any action for specific performance must be commenced within forty five (45) days following the Closing Date, and Purchaser shall have no claims hereunder against the Complying Seller Party other than for the refund of the Initial Deposit and the Additional Deposit from the Seller upon the termination of this Agreement. Notwithstanding anything set forth herein to the contrary, if a court of competent jurisdiction should invalidate this Agreement, it shall not constitute a Seller default and Purchaser's sole remedy shall be the return of the Deposit and the Additional Deposit.

17. <u>Limitation of Liability.</u>

(A) Should Purchaser wish to bring an action for an alleged breach of a representation or warranty hereunder it may do so only on the following conditions: (i) it first learned of the breach after Closing and files such action within ninety (90) days of the Closing, and (ii) it shall not have the right to bring a cause of action for a breach of a representation or warranty unless the damage resulting from such breach (individually or when combined with damages from other breaches) equals or exceeds Fifty Thousand ($50,000.00) Dollars, and (iii) Seller shall not have any liability after Closing for an alleged breach of a representation or warranty hereunder if the Purchaser had knowledge of such alleged breach as of or prior to the Closing. Furthermore, Purchaser agrees that the maximum liability of Seller for the alleged breach of any or all representations or warranties set forth in this Agreement is limited to Four Hundred Thousand ($400,000.00) Dollars in the aggregate. The provisions of this section shall survive Closing without limitation.

(B) Effective as of Closing, Purchaser hereby releases the Seller Parties, together with all of their respective direct or indirect members, managers, partners, officers, directors, employees, representatives, agents, shareholders, trustees and/or beneficiaries and all their respective current and former affiliates, heirs, successors, assigns, predecessors, attorneys, agents and related entities (collectively referred to herein as the "<u>Seller Related Parties</u>") from any and all liability in connection with any claims which Purchaser may have against the Seller or any of the Seller Related Parties, and, except with respect to any claim that Purchaser may have the right to assert pursuant and subject to the limitations set forth herein, Purchaser hereby agrees not to assert any claims, for damage, loss, compensation, contribution, cost recovery or otherwise, against the Seller or any of the Seller Related Parties, whether in tort, contract, or otherwise, relating directly or indirectly to the condition of the Premises. The provisions of this Section

4840-1508-6840, v. 1

shall survive Closing without limitation.

18.  **Notices.**  Notices hereunder shall be in writing and mailed by nationally recognized overnight courier, and via e-mail, to the respective addresses of the parties set forth below. Service shall be deemed effective upon the earlier of actual receipt of notice or one (1) business day after depositing with a nationally recognized overnight courier:

| | |
|---|---|
| If to Seller: | BR Lakewood LLC<br>Attention: Benjamin Ringel<br>1200 West Broadway<br>Hewlett, New York 11557<br>bringel@armstrong-capital.com<br><br>CR Lakewood LLC<br>Attention: Chana Ringel<br>c/o Koffsky Schwalb LLC<br>500 Seventh Avenue, 8th Floor<br>New York, N.Y. 10018<br>eschwalb@koffskyschwalb.com |
| With a copy to: | Mandelbaum Salsburg, PC<br>3 Becker Farm Road, Suite 105<br>Roseland, New Jersey 07068<br>Attention: Craig Alexander, Esq.<br>Email: calexander@lawfirm.ms |
| If to Purchaser | c/o Rushmore Management<br><br>Attention: Isaac Scheinerman<br>211 Blvd of the Americas, Suite 304<br>Lakewood, New Jersey 08701<br>Email: IS@rushmoremgmt.com |
| With a copy to: | Y Schwartz PC<br><br>Attention: Yisroel Schwartz, Esq.<br>930 E. County Line Rd, Suite 202<br>Lakewood, New Jersey 08701<br>Email: yschwartz@yslawpc.com |

19.  **Miscellaneous.**

   (A)  No provision of this Agreement may be changed or waived orally, but only by an instrument in writing signed by any Seller effected by the amendment and by Purchaser. This Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof, and supersedes all prior and contemporaneous representations, agreements, and understandings, whether written or oral.

(B) This Agreement shall be construed and enforced in accordance with the laws of the State of New Jersey. Each party hereby irrevocably submits to the exclusive jurisdiction of the courts of the State of New Jersey, for both subject matter and personal jurisdiction, in any dispute arising under this Agreement.

(C) This Agreement shall be binding upon and inure to the benefit of Seller and Purchaser and their respective successors and assigns. Purchaser shall not be permitted to assign this Agreement without each Seller Parties' prior written consent, except Purchaser is permitted to assign this Agreement to one or more entities controlled by or under common control with Purchaser. Notwithstanding any permitted assignment, the Purchaser shall remain liable under this Agreement.

(D) This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed to be an original, but all of which taken together shall constitute one and the same Agreement. Pdf or electronic signatures of this Agreement or any counterpart (and of any amendment to this Agreement) will be deemed a valid and binding execution of this Agreement and given the same effect as originals.

(E) If the time period by which any right, option or election provided under this Agreement must be exercised, or by which any act must be performed, or by which the Closing must be held, expires on a Saturday, Sunday, legal or bank holiday or Jewish holiday, then such time period shall be automatically extended through the close of business on the next business day.

(F) No party is entitled to any presumption with respect to the interpretation of any provision of this Agreement or the resolution of any alleged ambiguity based on any claim that the other party drafted or controlled the drafting of this Agreement.

(G) Purchaser covenants and agrees not to record this Agreement or any memorandum hereof and agrees that any recording hereof by Purchaser shall be deemed a material default hereunder. Nothing herein shall restrict Purchaser's title company from filing Notices of Settlement.

(H) The presentation of this document for consideration by the parties shall not constitute an offer, reservation or option for the Premises and this document shall become effective and binding only upon execution and delivery by all parties hereto

(I) Time shall be of the essence with respect to all time periods set forth in this Agreement.

20. <u>Jury Trial Waiver</u>. Seller and Purchaser hereby waive their rights to a trial by jury in any action or proceeding arising out of or related to this Agreement or its interpretation, enforcement or termination.

21. <u>Publicity and Confidentiality</u>. Purchaser and Seller agree that prior to the Closing, the terms of the transaction contemplated by this Agreement and all information made available by each Seller to Purchaser shall be maintained in strict confidence and prior to the Closing, no disclosure of such information be made by Purchaser, whether or not the transaction contemplated by this Agreement shall close, except to such attorneys, accountants, investment advisors, lenders and others as are reasonably required to evaluate and consummate such transaction. Purchaser and Seller each further agree that nothing in this Section shall prevent Purchaser or each Seller from disclosing or accessing any information otherwise deemed confidential under this Section (a) in connection with that party's enforcement or its rights hereunder; (b) pursuant to any legal requirement, any statutory or regulatory reporting requirement or any accounting or auditing disclosure requirement; (c) in connection with performance by either party of its obligations under this Agreement (including, but not limited to, delivery and recordation of

instruments, notices or other documents required hereunder); or (d) to potential investors, participants or assignees in or of the transaction contemplated in this Agreement or such party's rights therein.

22. **Section 1031 Exchange.** Purchaser or Seller may elect to exchange for other real estate of a like kind in accordance with Section 1031 of the Internal Revenue Code of 1986 as amended (the "Code"). To the extent possible, the provisions of this Section shall be interpreted consistently with this intent. To exercise any rights under this Section, the party electing to exchange shall provide the other with a written statement stating its intent to enter into an exchange prior to Closing. Either party's election to exchange, rather than sell or buy, for other real estate of a like kind shall be at no cost or liability to the other, and the parties agree to cooperate with each other and to promptly execute and deliver any documents reasonably necessary or desirable to effect such an exchange, provided that such request for cooperation does not cause a delay in Closing.

23. **Bulk Sale Notification.** The parties hereby acknowledge that pursuant to N.J.S.A. 54:50-38, the Purchaser is required to notify the Director of the Division of Taxation in the Department of the Treasury of the State of New Jersey (the "Department"), at least ten (10) business days prior to the Closing, of the proposed sale and of the price, terms and conditions of the transaction. In the event the Department determines that any or all of the Seller's proceeds are to be paid out of the Seller's proceeds at the Closing or held in escrow following the Closing, then such funds as determined by the Department shall be paid directly to the Department or held in escrow by the Escrow Agent until such time as the parties are in receipt of a tax clearance letter from the Department authorizing the release of the escrow. Purchaser shall be responsible for submitting the required notification of the pending sale to the Department, and shall deliver a copy to Seller's attorney prior to filing. Seller's attorney shall make any comments it deems reasonably necessary and return it to Purchaser's attorney who shall then file such application with the Department. Seller agrees to fully cooperate with any such submissions. Purchaser or its attorney shall prepare the Notification of Sale, Transfer or Assignment in Bulk and shall file same with the Department in accordance with this paragraph. Seller shall have the right to require Purchaser to include an Asset Transfer Tax Declaration along with the notice. The terms of this Section shall survive the Closing.

24. **Escrow Agent.** Escrow Agent shall not be liable to any party for any act or omission except for bad faith or gross negligence, and the parties agree to indemnify the Escrow Agent and hold the Escrow Agent harmless from any claims, damages, losses or expenses arising in connection herewith. The parties acknowledge that the Escrow Agent is acting solely as a stakeholder for their convenience. The Escrow Agent shall not be required to defend any legal proceedings which may be instituted against it with respect to the escrowed funds, the Property or the subject matter of this Agreement unless requested to do so by Seller and Purchaser and indemnified to its satisfaction against the cost and expense of such defense. The Escrow Agent shall not be required to institute legal action or proceedings of any kind or nature and shall have no responsibility for the genuineness or validity of any document or other item deposited with it or the collectability of any check delivered in connection with this Agreement. Escrow Agent shall be fully protected in acting in accordance with any written instructions given to it hereunder and believed by it to be signed by the proper parties. Escrow Agent shall provide the parties with five (5) business days written notice before releasing the Deposit. In the event the Escrow Agent receives written notice of an objection to the release of the Deposit, the Escrow Agent shall not release the Deposit but shall either continue to hold the Deposit until otherwise directed in a writing signed by Purchaser and Seller, or by a final, non-appealable order of a court of competent jurisdiction. Escrow Agent may also deposit the Deposit with a court of competent jurisdiction. Upon such deposit, the Escrow Agent will be released from all duties hereunder. This provision shall survive Closing.

*(signature page follows)*

4840-1608-6840, v. 1

IN WITNESS WHEREOF, the parties have executed this Agreement the day and year first above written.

WITNESS: *[signature]*

BCR Pinewood Realty LLC

By: *[signature]* Chana Ringel
Name: Chana Ringel
Title: Manager

*[signature]*

BR Lakewood LLC
(Benjamin Ringel, by Lynne Dunn, Esq.
By: as Special Agent as Power of Attorney as
Name: Authorized by the February 4, 2022 Order
Title: entered by the Honorable Francis R. Hodgson, Jr., P.J.Ch.
in Docket No's OCN-C-127-15 and OCN-C-152-16

CR Lakewood LLC

By: *[signature]* Chana Ringel
Name: Chana Ringel
Title: Manager

*[signature]*

WITNESS:

PURCHASER:

Rushmore Capital, L.L.C.

Malka Basser

By: *[signature]*
Name: Yitzchak Schelnerman
Title: Managing Member

Escrow Agent:

Madison Title Agency

By: _____
Name:
Title:

4840-1508-6840, v. 1