**<u>EXHIBIT H</u>**

## LIMITED LIABILITY COMPANY OPERATING AGREEMENT

### OF

### AC I MZ TOMS RIVER LLC

This LIMITED LIABILITY COMPANY OPERATING AGREEMENT (this *"Agreement"*) of AC I MZ TOMS RIVER LLC (the *"Company"*) is entered into by and among BENJAMIN RINGEL, an individual having an address c/o Armstrong Capital, LLC, 70 E. Sunrise Highway, Suite 410, Valley Stream, New York 11581; AC RETAIL EQUITY FUND I LLC, having an address c/o Armstrong Capital, LLC, 70 E. Sunrise Highway, Suite 410, Valley Stream, New York 11581 (*"AC Retail"*), TIBOR KLEIN, an individual having an address at 1644 East 28 Street, Brooklyn, New York 11210, CHANA RINGEL, an individual having an address at 100 West 89 Street, Apt. 7I, New York, New York 10024 and MICHAEL KRULL, an individual having an address at 5 Hastings Road, Monsey, New York 10952 (each of the foregoing, with the exception of Benjamin Ringel who shall initially serve as a non-member Manager in accordance with Section 5.1 below, and any transferee or additional member who has been admitted to the Company in accordance with Article II below is herein individually called a *"Member"* and collectively called the *"Members"*).

WHEREAS, the Company was formed pursuant to the Delaware Limited Liability Company Act, 6 Del. C. 18-101 et seq. (as same may be amended from time to time, the *"Act"*) by the filing of certificate of formation with the Secretary of State of the State of Delaware on July 16, 2004.

NOW, THEREFORE, the parties agree as follows:

### ARTICLE I
### FORMATION OF COMPANY

1.1   **Name.** The name of the Company is "AC I MZ TOMS RIVER LLC."

1.2   **Purposes.** The purposes of the Company are to (a) acquire, own, operate, develop, redevelop, lease, finance, sell and exchange direct or indirect interests in the land described on Exhibit A attached hereto, and all buildings, other improvements and all appurtenances thereto, and all additions or exchanges thereto (the foregoing as in existence from time to time, is herein collectively called the *"Real Estate"*), (b) engage in any and all activities necessary, desirable or incidental thereto and (c) engage in any other lawful business for which limited liability companies may be organized under the Act.

1.3   **Term.** The term of the Company commenced on July 16, 2004 and shall continue until dissolved pursuant to the laws of the State of Delaware.

1.4   **Fiscal Year.** The fiscal year of the Company shall be the calendar year.

1.5   **Principal Place of Business.** The principal place of business of the Company shall be at such place as the Manager shall designate from time to time.

## ARTICLE II
## MEMBERSHIP

2.1     **Capital Contributions and Loans by Members.** No Member shall be required to lend any funds to the Company or make any Capital Contributions other than as provided in Article III.

2.2     **Meetings of the Members and Managers.** The Members shall meet only upon the call of the Manager or more than 50% of the Members. It shall not be necessary for a Member or Manager to meet in order to take any action authorized herein. Whenever the vote or the consent of a Member or Manager is required under this Agreement or the Act, each such party may vote by written communication or by proxy and may consent in writing without prior notice and without a meeting.

2.3     **Liability of Members.** Except as otherwise required by applicable law and as expressly set forth in this Agreement, no Member shall have any personal liability whatsoever in its capacity as a Member, whether to the Company, to any of the other Members, to the creditors of the Company or to any other third party, for the debts, liabilities, commitments or any other obligations of the Company or for any losses of the Company.

2.4     **Lack of Authority.** Except as expressly set forth in this Agreement, no Member has the authority or power to represent, act for, sign for or bind the Company, to do any act that would be binding on the Company or to make any expenditures or incur any obligations on behalf of the Company.

2.5     **Transfers.**

2.5.1   *Except as set forth herein,* no Member shall sell, assign, transfer, pledge, hypothecate, grant a security interest in, encumber or in any way dispose of all or any part of its interest in the Company, including without limitation, the Company's capital, profits or losses (collectively, a *"Membership Interest"*) without the prior written consent of the Manager, which consent may be withheld in the Manager's sole and absolute discretion. Transfers of direct or indirect interests in a Member shall be deemed a transfer by such Member of a Membership Interest in the Company for purposes of this Section 2.5. Any attempt to make a sale, assignment, transfer, pledge, hypothecation, mortgage, encumbrance or other disposition of a Membership Interest, or any part thereof, by a Member without the consent of the Manager shall be void and shall not bind or be recognized by the Company, and in such event, in addition to all other rights and remedies the Manager and any Member may have in law, in equity or under the provisions of this Agreement, the Manager or any Member shall be entitled to a decree or order restraining and enjoining such attempted sale, assignment, transfer, pledge, hypothecation, mortgage, encumbrance or other disposition, and the offending Member shall not plead in defense thereto that there would be an adequate remedy at law, it being recognized and agreed that the injury and damage resulting from such a breach would be impossible to measure monetarily. So long as the person serving as the Manager is Benjamin Ringel, AC Retail may not transfer all or any portion of its Membership Interest in the Company without the consent of Tibor Klein; provided, however, if (a) following the transfer day to day management of the transferee will be controlled by Benjamin Ringel or (b) immediately before the transfer Tibor

-2-

Klein is not a Member or he is in default of this Agreement, Tibor Klein's consent shall not be required for such transfer.

2.5.2    Notwithstanding the provisions of Section 2.5.1 above, the Manager may not unreasonably withhold, condition or delay its consent to the assignment, or a transfer by operation of law, of a right to receive direct or indirect distributions and allocation of profit and loss under Article IV of this Agreement (a) to an immediate family member (i.e. spouse, children, siblings, parents and nieces and nephews) of a beneficial owner of a Member or trusts or other entities for the benefit of such person's immediate family and (b) to any person resulting from the death of a Member or a beneficial owner of a Member. In either of such events, by virtue of an assignment or transfer by or from a Member the transferee shall not become a Member of the Company without the consent of the Manager, which may be granted or withheld in the Manager's sole and absolute discretion. In the event of any such assignment or transfer or in the event of any other transfer of all or any part of a Member's Membership Interest, in each such case, the transferor (and any Member controlled by such transferor) shall cease to be a Member and shall lose the power to exercise any rights or powers of a Member.

2.6    **Withdrawal of Members.** Members may not withdraw from the Company prior to the dissolution and winding up of the Company without the prior written consent of the Manager, which may be granted or denied in the Manager's sole and absolute discretion.

2.7    **New Members.** No new Member may be admitted to the Company without the prior written consent of the Manager and Tibor Klein, which may be granted or denied in each of their sole and absolute discretion; provided, however, Tibor Klein's consent shall not be required if he is not then a Member or is default of this Agreement. Upon admitting a new Member, the new Member's Percentage Interest shall equal the percentage the new Member's Capital Contribution bears to the fair market value of the Company as increased by the new Member's Capital Contribution. Each Member's Percentage Interests shall decrease by the product of (a) such Member's Percentage Interest, immediately prior to the Capital Contribution of the new Member, expressed as a fraction and (b) the new Member's Percentage Interest. The determination of the fair market value of the Company and the calculation of and adjustments to the Percentage Interests shall be determined in the Manager's sole and absolute discretion. The Manager is authorized to amend or restate this Agreement, on behalf of the Members, to reflect the admission of the new Member and the adjustment to the Percentage Interests.

2.8    **Prohibited Transfer and Admission.** In no event shall the Manager consent to any transfer of an interest or the admission of a new Member in the event that (a) either the offering, the transfer or the admission would violate any federal or state securities law or regulation, (b) the transfer or admission would cause a termination of the Company pursuant to Section 708(b)(1)(B) of the Internal Revenue Code of 1986, as amended from time to time (the "*Code*"), (c) the offering, the transfer or the admission would cause the Company to be a "publicly traded partnership" within the meaning of Section 7704(b) of the Code or (d) the transfer is to a minor or an incompetent.

2.9    **Record Owner.** The Company and the Manager shall be entitled to treat the record owner of any Company interest as the absolute owner thereof in all respects, and shall incur no liability for distributions of cash or other property made in good faith to such owner until such time as a written instrument conveying such interest has been received and accepted by the Manager and recorded on the books of the Company. The Manager may refuse to accept an assignment until the end of the calendar year following the assignment.

2.10    **No Restrictions.** Any Member, regardless of whether such Member or Manager is acting as a manager of the Company, and any affiliate or any director, officer, employee, partner or other person or entity related to any Member may engage in or possess a business interest in other business ventures of every nature and description, independently or with others, including but not limited to, the ownership, operation, or investment in any real estate or real estate development wherever located. Neither the Company nor any Member or any affiliate or entity related to any of them shall have any rights by virtue of this Agreement in and to such independent ventures or to the income or profits derived therefrom.

2.11    **Reimbursement for Company Expenses.** The Company shall bear all expenditures incident to its formation. Each Member shall be entitled to reimbursement by the Company for all out-of-pocket expenses reasonably paid or incurred by it in connection with the discharge of its duties and obligations under this Agreement.

2.12    **Investment Representations.** Each of the Members represents and warrants to the other Members and to the Company that:

(a)    Such Member is acquiring an interest in the Company for its own account, for investment only and not as nominee or agent, and not with a view to the resale or distribution of any part thereof;

(b)    Such Member understands that he must bear the economic risk of its investment in the Company for an indefinite period of time because the interests in the Company are not registered under the Securities Act of 1933, as amended, or under any state securities laws, and such investment may not be resold unless subsequently registered or unless an exemption from registration is available, and it does not have the right to require such registration; and

(c)    The Member is either (i) an individual whose net worth, or joint net worth with his spouse at the time of his purchase, exceeds $1,000,000; (ii) an individual who had an income in excess of $200,000 in each of the two most recent years or joint income with his spouse in excess of $300,000 in each of those years and who reasonably expects an income in excess of the same income level in the current year; (iii) an organization described in Section 501(c)(3) of the Code, corporation, Massachusetts or similar business trust or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000; (iv) a trust with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a person having such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the prospective investment; or (v) an entity in which all of the equity owners are persons who fall into categories (i), (ii), (iii) or (iv) above.

-4-

## ARTICLE III
## CAPITAL ACCOUNTS

3.1   **Capital Contributions and Percentage Interests.**   The term "*Capital Contributions*", as used in this Agreement, shall mean the aggregate amounts of money or the fair market value of property contributed to the Company. Each Member shall be required to contribute to the Company, within one (1) Business Day of the Manager's request (which may be given in person, telephonically, by email or in writing), cash in proportion to their relative Percentage Interests (as defined below) in the amounts (a) necessary to close the acquisition of the Real Estate and (b) appropriate, as reasonably determined by the Manager, for the Company's initial working capital and reserves. Each Member's percentage interest in the Company shall initially be as shown on Schedule 1 attached hereto, subject to adjustment pursuant to the terms of this Agreement (each such percentage, as same may be adjusted from time to time, is herein individually called a "*Percentage Interest*" and collectively called the "*Percentage Interests*"). Any Capital Call (as defined in Section 3.2.1 below) or series of Capital Calls by the Manager aggregating in excess of $3 million to fund a single capital improvement to the Real Estate, shall be subject to the prior consent of Tibor Klein; provided, however, if Tibor Klein is not then a Member or is then in default of the Agreement his consent shall not be required.

3.2   **Additional Capital Contributions.**

3.2.1   The Manager, in good faith, may from time to time determine that it is desirable for the Company to have additional Capital Contributions in furtherance of the purposes of the Company (any such contributions are hereinafter referred to as "*Additional Capital Contributions*"). In such event, the Manager shall send a notice to the Members stating the amount of the desired Additional Capital Contribution (the "*Capital Call*"). If a Capital Call is made in accordance with the foregoing, each Member shall within ten (10) days after the date of the Call Notice (the "*Call Period*") contribute, or elect not to contribute, to the Company in cash, its ratable share ("*Ratable Share*") of the Capital Call. Failure to timely contribute its Ratable Share of the Capital Call shall be deemed an election by such Member not to contribute its Ratable Share of the Capital Call. Each Member's Ratable Share of a Capital Call shall be the amount determined by multiplying such Member's Percentage Interest in the Company at the time of the Call Notice, by the aggregate amount of the Capital Call.

3.2.2   If a Member elects, or is deemed to have elected, not to contribute an amount (the "*Default Amount*") equal to its Ratable Share of the Capital Call (the "*Failing Member*"), and some or all of the other Members (each "*Non-Failing Member*") have made their respective entire required contributions and all or some of such Non-Failing Members have made additional Capital Contributions to cover the entire Default Amounts (the Non-Failing Members wishing to make such additional Capital Contributions may contribute in proportion to their respective Percentage Interests), then each Failing Member's Percentage Interest immediately following the making of the Non-Failing Members' contributions shall be reduced (but not below zero) by a fraction, the numerator of which is an amount equal to their respective Default Amount and the denominator of which is the sum of all Capital Contributions theretofore contributed by all Members and the Percentage Interests of each of the Non-Failing Members who made additional Capital Contributions on account of the Default Amounts shall be increased

-5-

by the percentage points by which the Failing Member's Percentage Interest were decreased pursuant to this Section 3.2.2 multiplied by a fraction, the numerator of which is the amount of such Member's Capital Contribution on account of the Default Amounts, and the denominator of which is the sum of all Default Amounts. If some or all of the Non-Failing Members have not in the aggregate contributed the Default Amounts, then each Non-Failing Member may elect to withdraw from the Company its Capital Contribution made in satisfaction of the Capital Call and any portion of the Default Amount.

3.3    **Capital Accounts.** A capital account ("*Capital Account*") shall be established for each Member and shall be maintained jn accordance with Treasury Regulation Section 1.704-1(b)(2)(iv).

3.4    **Negative Capital Accounts.** No Member shall be required to pay to the Company or to any other Member any deficit or negative balance which may exist from time to time in such Member's Capital Account.

3.5    **Company Capital.** No Member shall be paid interest on any Capital Contribution or on such Member's Capital Account, and no Member shall have any right (a) to demand the return of such Member's Capital Contribution or any other distribution from the Company (whether upon resignation, withdrawal or otherwise), except upon dissolution of the Company or (b) to cause a partition of the Company's assets.

## ARTICLE IV
## DISTRIBUTIONS; ALLOCATIONS
## OF PROFITS AND LOSSES

4.1    **Distributions.** Distributions of cash flow and capital proceeds of the Company shall be made at such times and in such amounts as determined in Manager's sole but reasonable business judgment. Subject to the retention and establishment of reserves and payment to third parties of such funds as the Manager deems necessary for the Company's business needs, the Manager shall cause the Company to make quarterly distributions

4.1.1    **Order of Distributions.** To the extent available, distributions shall be made in the following order of priority:

(a)    First, distributions shall be distributed to the Members, *pro rata*, in proportion to their respective Percentage Interests, until such time as the Members (excluding any new Members and any Member whose Percentage Interest has been reduced for failing to contribute its Ratable Share of a Capital Call) receive an eleven (11%) percent Internal Rate of Return (as defined in Section 4.1.3 below) with respect to their respective Capital Contributions to the Company.

(b)    Then, (i) 80% of each distribution shall be distributed to the Members, *pro rata*, in proportion to their respective Percentage Interests, and (ii) 20% of each distribution shall be distributed to AC Retail until such time as the Members (excluding any new Members and any Member whose Percentage Interest has been reduced for failing to contribute its Ratable Share of a Capital Call) receive a fifteen (15%) percent Internal Rate of Return with respect to their respective Capital Contributions to the Company.

(c)      Then, (i) 70% of each distribution shall be distributed to the
Members, *pro rata*, in proportion to their respective Percentage Interests, and (ii) 30% of each
distribution shall be distributed to AC Retail until such time as the Members (excluding any new
Members and any Member whose Percentage Interest has been reduced for failing to contribute
its Ratable Share of a Capital Call) receive a twenty (20%) percent Internal Rate of Return with
respect to their respective Capital Contributions to the Company.

(d)      Thereafter, (i) 75% of each distribution shall be distributed to the
Members, *pro rata*, in proportion to their respective Percentage Interests, and (ii) 25% of each
distribution shall be distributed to AC Retail.

Distributions made to AC Retail under Sections 4.1.1(b)(ii), 4.1.1(c)(ii), and 4.1.1(d)(ii) are
referred to herein as the *"Carried Interest Distributions"*

4.1.2   For purposes of calculating the Internal Rate of Return, Carried
Interest Distributions made to AC Retail shall be excluded from the calculation.

4.1.3   *"Internal Rate of Return"* shall mean that interest rate which, when
used as a discount rate, causes (a) the net present value of the cumulative distributions made to a
Member by the Company from the respective dates of the Member's Capital Contributions
through the computation date, to equal (b) the net present value of the Member's Capital
Contributions from the date such Capital Contributions are contributed to the Company. For
purposes of this definition, net present value shall be determined using annual compounding
periods and any such contributions by the Member during a year shall be deemed to occur on the
date made. The Internal Rate of Return shall be calculated using a methodology and formula
selected by the Manager in the Manager's sole but reasonable discretion.

**4.2    Allocation of Profits and Losses.** Except as otherwise required under the
Internal Revenue Code of 1986, as amended (the *"Code"*) and applicable Treasury Regulations:

4.2.1   Profits shall be allocated among the Members for each fiscal year
or other accounting period as follows:

(a)      First, up to the amount by which Losses allocated to the
Members for prior accounting periods pursuant to Sections 4.2.2 exceed Profits previously
allocated to the Members pursuant to this Section 4.2.1 for all prior accounting periods, to the
Members, *pro rata*, in the same proportion and reverse order that such excess amounts were
previously allocated such that the Profits so allocated completely offset such Losses starting with
the Losses from the most recent accounting period;

(b)      Then, AC Retail until the cumulative Profits and items of
income and gain allocated to AC Retail exceed the cumulative Losses and items of loss and
deduction allocated to AC Retail by an amount equal to the cumulative Carried Interest
Distributions to AC Retail, with the balance to the Members, *pro rata*, in proportion to their
respective Percentage Interests.

4.2.2   Losses shall be allocated among the Members for each fiscal
year or other accounting period as follows:

-7-

(a)     First, up to the amount by which Profits allocated to the Members for prior accounting periods pursuant to Section 4.2.1 exceed Losses previously allocated to the Members pursuant to this Section 4.2.2 for all prior accounting periods, to the Members, *pro rata,* in the same proportion and reverse order that such excess amounts were previously allocated such that the Losses so allocated completely offset such Profits starting with the Profits from the most recent accounting period; and

(b)     The balance, if any, to the Members, *pro rata,* in proportion to their respective Percentage Interests.

4.2.3     It is contemplated by the parties that Profits and Losses (including items of income, gain, loss, deduction with respect thereto) for any fiscal year which is attributable to either: (a) a sale of Company assets or (b) a deemed disposition of Company assets upon their distribution in kind in connection with a liquidation of the Company, and if necessary, other items of Company income, gain, loss and deduction for such fiscal year and other fiscal years of the Company, as applicable, shall be allocated among the Members in such proportions as shall cause the Capital Accounts of each Member, as nearly as practicable, to equal the amount that would be distributable to such Member if the Company sold all of its remaining assets at their then Book Value, and distributions in liquidation of the Company (after satisfying its liabilities) were made in accordance with Section 4.1 hereof.

4.2.4     Notwithstanding the foregoing, the Capital Accounts and allocations of income, gain, loss, deductions and credits for income tax purposes shall all be made strictly in accordance with Section 704(b) and 704(c) of the Code and the Treasury Regulations thereunder, including the "qualified income offset" of Treasury Regulation §1.704-1(b)(2)(ii)(d) and the rules concerning allocations attributable to nonrecourse liabilities of Treasury Regulation §1.704-2.

4.2.5     Certain Definitions.

(a)     *"Profits"* for any period shall mean the excess, if any, of all items of income and gain of the Company over all items of loss, deduction and expense of the Company for such period, determined in accordance with, and subject to any adjustments required under, applicable Treasury Regulations.

(b)     *"Losses"* for any period shall mean the excess, if any, of all items of loss, deduction and expense of the Company over all items of income and gain of the Company for such period, determined in accordance with, and subject to any adjustments required under, applicable Treasury Regulations.

(c)     *"Book Value"* shall mean, with respect to any Company asset, the Company's adjusted basis for Federal income tax purposes, adjusted from time to time to reflect the adjustments required or permitted by Treasury Regulations Section 1.704-1(b)(2)(iv)(d)-(g) and/or the other applicable Treasury Regulations.

-8-

## ARTICLE V
## MANAGEMENT

### 5.1    Management.

5.1.1    **Authority of the Manager.**    The business and affairs of the Company shall be managed solely by the manager (the *"Manager"*) who shall have the sole and exclusive right and power to make all decisions and take all action with respect to the management of the business and affairs of the Company. The Manager may appoint a party or parties to replace it as Manager or to serve together with it as the Manager. If at any time there should be more than one (1) party serving as the Manager, the Manager appointing such party or parties shall designate in writing at the time of such appointment whether the parties who will be serving as the Manager must act unanimously or may act independently of each other or otherwise in carrying out the duties of the Manager. In the event of any dispute between the parties acting as the Manager where their unanimous consent is required or where a deadlock has occurred, the provisions of Section 5.2 shall apply. Every contract, deed, mortgage, deed of trust, pledge, lease, credit agreement or other instrument executed by the Manager shall be conclusive evidence in favor of every person or entity relying thereon or claiming thereunder that at the time of the delivery thereof that: (a) the Company was in existence, (b) neither this Agreement nor the Certificate of Formation of the Company had been amended in any manner except as otherwise set forth in any such instrument and (c) the execution and delivery of such instrument was duly authorized by the Company. Any person or entity may always rely on a certificate addressed to such person or entity and signed by the Manager: (i) as to the existence or non-existence of any fact which constitutes a condition precedent to acts by the Manager or in any other manner germane to the affairs of the Company, (ii) setting forth the persons and/or entities who are authorized to execute and deliver any instrument or document on behalf of the Company, (iii) certifying as to the authenticity of any copy of the Certificate of Formation of the Company, this Agreement, any amendments thereto and hereto and any other document relating to the conduct of the affairs of the Company and (iv) as to any action taken or not taken by the Company or as to any other matter whatsoever involving the Company.

5.1.2    **Designation of the Manager.**    Benjamin Ringel shall serve as the initial Manager. Unless otherwise agreed to by the Manager in writing, the Manager shall serve until resignation, death, determination of mental or physical disability that renders the Manager unable to perform the duties of the Manager, or removal in accordance with this Agreement. The person or entity acting as a Manager shall designate a successor Manager if such Manager should cease to serve as a Manager for any reason. If a Manager fails to designate a successor, and is disabled or deceased, the Manager's legal representative shall designate the successor Manager. A Manager may only be removed as Manager by the unanimous vote of the Members and all parties then serving as Manager (excluding the Manager being voted on and any entity controlled by such Manager, which may then be a Member) if such Manager's willful misconduct caused a material adverse consequence to the Company and such Manager received notice from a Member or other Manager describing in reasonable detail the Manager's willful misconduct and the material adverse consequence resulting therefrom and the Manager then failed to correct such materially adverse consequence in the 60-day period after receipt of such notice. If a Manager is removed due to such Manager's willful misconduct and there are no remaining parties serving as the Manager, the remaining Members (including the removed Manager or an entity controlled

-9-

by the removed Manager, if such person or entity is a Member of the Company) holding a majority of the Percentage Interests in the Company shall appoint a new Manager. All transactions between affiliates of the Manager and the Company shall be at market rates. The management fee paid for property management of the Real Estate shall not exceed four (4%) percent of the gross receipts derived from the Real Estate.

5.1.3    **Officers.** Without limiting the generality of the foregoing, the Manager shall have the authority to appoint officers of the Company as he or she deems desirable to effectuate and carry out the business of the Company. Such appointed officers shall be responsible for, and have the authority to, carry out the business of the Company to the extent authorized by the Manager.

5.2    **Management Disputes.**

5.2.1    **Statement of the Dispute.** If at any time there is more than one person or entity serving as the Manager and the parties serving as the Manager fail to agree on any matter relating to the management of the Company which requires unanimous consent (or there is any other deadlock), then a Manager may give to the other party or parties serving as the Manager a written statement (the "*Manager's Statement*") setting forth in reasonable detail the action such Manager (the "*Initiating Manager*") is seeking the Company to take and the reasons for taking such action. The other party or parties serving as the Manager (the "*Other Manager*") shall have ten (10) Business Days to respond (the "*Other Manager's Response*") to the Manager's Statement, failing which the Initiating Manager may unilaterally cause the Company to take all necessary action to carry out the action set forth in the Manager's Statement and all matters reasonably related thereto. If the Other Manager timely gives the Other Manager's Response to the Initiating Manager and the Initiating Manager and Other Manager, in the thirty (30) Business Day period thereafter, fail to resolve the dispute, then the Initiating Manager may submit the Manager's Statement and the Other Manager's Response to the Arbitrator (as defined in Section 5.2.3 below), with a copy to the Other Manager, and request that the Arbitrator decide whether the Initiating Manager's or the Other Manager's position is in the best interest of the Members having a majority in interest of the Percentage Interests.

5.2.2    **Arbitration.** The Arbitrator's ruling shall be in writing and be binding on the Initiating Manager, the Other Manager, the Members and the Company. If requested by the Arbitrator, the Initiating Manager and the Other Manager will meet with the Arbitrator to present and discuss their respective positions and furnish the Arbitrator with such information as the Arbitrator reasonably requests in order to rule on the dispute. Prior to and during any such discussions, the Initiating Manager and the Other Manager may modify their positions by notifying the other party and the Arbitrator of such modification. The Arbitrator, in his sole discretion, shall decide what information and discussion, if any, is necessary to rule on the dispute. The Arbitrator shall only be authorized to accept either the Initiating Manager's position, as set forth in the Manager's Statement, or the Other Manger's position, as set forth in the Other Manager's Response, in each case as such positions may have been modified in accordance with this Section 5.2.2. If the Arbitrator determines that the Initiating Manager's position is in the best interest of the Members, than the Initiating Manager shall be authorized unilaterally to take all necessary action, or cause the Company to take such action, to carry out the position set forth in the Manager's Statement, as same may have been modified, and all

-10-

matters reasonably related thereto. If the Arbitrator determines that the Other Manager's position is in the best interests of the Members, then the Initiating Manager shall not be authorized to take the action's objected to in the Other Manager's Response, as same may have been modified.

5.2.3 **Arbitrator.** The parties serving as the Manager shall designate the Arbitrator (the term "*Arbitrator*" shall mean such individual or his successors appointed in accordance with the terms of this Section 5.2.3). By a written instrument signed by each party serving as a Manager, the designated Arbitrator may be replaced with another person. If at the time of a dispute there is no then designated Arbitrator or the then designated Arbitrator dies, becomes disabled or is unwilling or otherwise unable to act as the Arbitrator hereunder, each party serving as the Manger shall act in good faith to select a new or replacement Arbitrator. If they are unable to agree on a new or replacement Arbitrator within thirty (30) Business Days after the parties failed to resolve their dispute pursuant to Section 5.2.1, then within seven (7) Business Days thereafter each party serving as a Manager shall select a person who has an ownership interest in and management rights over at least two (2) million square feet of retail space in the State of New Jersey to work together to designate the new or replacement Arbitrator. If either party fails timely to designate such a person, the person timely designated shall have the sole right to designate the new or replacement Arbitrator. If the designees do not reach agreement within seven (7) Business Days after the date that the last designee has been designated, then such designees shall designate another person, having the same minimum qualifications as required above for the first the designees, to designate the new or replacement Arbitrator. If the designees fail to agree upon the designation of another person to designate the Arbitrator, then such person shall be appointed by a justice of the Supreme Court of New York State. The decision of the person designated by the designees or by the justice of the Supreme Court of New York State, as the case may be, shall be in writing and shall be binding upon the Manager, the Company and the Members.

5.3 **Manager's Time.** Each party serving as a Manager shall devote to the affairs of the Company so much of its time as such party deems necessary or advisable properly to carry on the Company's business. The Manager shall not receive any salary or similar fees in connection with its services hereunder.

5.4 **No Restrictions.** Each party serving as a Manager, and any affiliate or any director, officer, employee, partner, member or other person or entity related to such party may engage in or possess a business interest in other business ventures of every nature and description, independently or with others, including but not limited to, the ownership, operation, or investment in any real estate or real estate development wherever located. Neither the Company nor any Member or any affiliate or entity related to any of them shall have any rights by virtue of this Agreement in and to such independent ventures or to the income or profits derived therefrom.

5.5 **Nonliability and Indemnity of Manager.** To the full extent permitted by law, the Manager is released from liability for damages and other monetary relief on account of any act, omission, or conduct in the Manager's managerial capacity (other than intentional and willful misconduct by the Manager which causes the Company to suffer a substantial loss in value) and to the full extent permitted by law shall be indemnified by the Company for any

-11-

claims arising out of any act, omission, or conduct in the Manager's managerial capacity. No amendment or repeal of this section affects any liability or alleged liability or indemnity of the Manager for any act, omission or conduct that occurred prior to the amendment or repeal.

5.6    **Reimbursement for Company Expenses.** The Manager shall be entitled to reimbursement by the Company for all out-of-pocket expenses reasonably paid or incurred by it in connection with the discharge of its duties and obligations under this Agreement.

## ARTICLE VI
## TAXES

6.1    **Tax Elections.** The Manager shall determine all tax elections to be made by the Company.

6.2    **Tax Matters Partner.** The Manager shall designate a Member to be the "tax matters partner" of the Company under Section 6231(a)(7) of the Code.

## ARTICLE VII
## DISSOLUTION, LIQUIDATION AND TERMINATION

7.1    **Dissolution.** The Company shall be dissolved and its affairs shall be wound up in accordance with the provisions of the Act and this Agreement. The Manager shall wind up the affairs of the Company. The assets of the Company shall be distributed first to pay or establish reserves for all liabilities of the Company, and then in accordance with the provisions of Section 4.1 above.

7.2    **Deficit Capital Accounts.** Notwithstanding anything to the contrary contained in this Agreement and notwithstanding any custom or rule of law to the contrary, upon dissolution of the Company any deficit in the Capital Account of any Member shall not be an asset of the Company and such Members shall not be obligated to contribute any amount to the Company to bring the balance of such Member's Capital Account to zero.

## ARTICLE VIII
## BOOK AND RECORDS; REPORTS

8.1    **Books and Records.**    The Company shall maintain at a location designated by the Manager books of account with respect to the operations of the Company. Each Member shall have the right, upon reasonable prior notice, during normal business hours, on Business Days, and in a manner that does not disrupt the business of the Company, to examine and copy, at such Member's expense, for purposes relating to the evaluation of his membership interest, the Company's records set forth above, any financial statements maintained by the Company for the three most recent fiscal years, and any other information related to the affairs of the Company.

8.2    **Access to Books and Records.** Any Member shall have the right to examine, or have his duly authorized representative examine, the records and books of account of the Company upon reasonable prior notice, during normal business hours, on Business Days, and in a manner that does not disrupt the business of the Company and to copy such books and

-12-

118427.00410/6347763v9

records, at such Member's expense, for purposes relating to the evaluation of such Member's membership interest.

   8.3 **Accounting Basis and Fiscal Year.** The Company's books shall be kept on the method of accounting selected by the Tax Matters Member.

   8.4 **Reports.** The Manager shall provide the Members with quarterly financial statements showing the income and expenses of the Company for such period. As soon after the end of each fiscal year as practical, the Manager shall cause to be furnished to each Member such information as may be needed to enable each Member to file its Federal income tax return and any required state income tax return. Any Member may, at any time, and at such Member's expense, cause an audit of the Company books to be made by a certified accountant of his selection.

## ARTICLE IX
## SPECIAL POWER OF ATTORNEY

   9.1 **Grant of Power of Attorney.** Each Member, by its execution of this Agreement, hereby irrevocably makes, constitutes and appoints the Manager as its true and lawful attorney-in-fact, with power and authority in its name, place and stead, to make, execute, sign, acknowledge and file on behalf of each of them and on behalf of the Company such certificates, amendments, documents, and instruments as are deemed necessary or desirable by the Manager, in the sole and absolute discretion of the Manager, to effectuate the actions for which the Manager is authorized or to effectuate, implement, continue and defend the valid and subsisting existence, rights and property of the Company as a limited liability company and its power to carry out its purposes as set forth in this Agreement. The foregoing shall in no way empower or authorize the Manager to impose new obligations on a Member which are not provided for in the other Articles of this Agreement.

   9.2 **Terms of Grant.** The foregoing appointment:

     9.2.1 Is irrevocable and shall be deemed to be a special power coupled with an interest;

     9.2.2 Shall survive the dissolution, termination, disability, death or bankruptcy of any Member granting the same and the transfer, by operation of law or otherwise, by any such granting Member of the whole or any part of its interest in the Company, its capital, profits or losses hereunder; and

     9.2.3 May be exercised by the Manager on behalf of each Member by a facsimile signature of the Manager or by listing all of the Members executing any instrument with a single signature of the Manager, as attorney-in-fact for all of them.

   9.3 **Separate Form.** The foregoing appointment is self operative but, in confirmation thereof, each Member hereby agrees to execute, acknowledge and deliver to the Manager, promptly upon request therefor by the Manager, a power of attorney in recordable form satisfactory to the Manager evidencing the foregoing appointment.

## ARTICLE X
## GENERAL PROVISIONS

10.1   **Offset.** Whenever the Company is to pay any sum to any Member, any amounts that Member owes to the Company that are then due may be deducted from that sum before payment.

10.2   **Attorneys' Fees.** In the event that an action or proceeding should be brought by any Member or party serving as a Manager against another Member or party serving as a Manager or their respective affiliates for the violation of any term, covenant, condition or provision of this Agreement, then the non-prevailing party in such action or other proceeding shall be liable to pay to the prevailing party the reasonable fees and disbursements incurred by the prevailing party's counsel in such action or other proceeding, as well as any and all court costs (through all appeals).

10.3   **Business Day.** The term *"Business Day"* shall mean every day that is not a Saturday, Sunday, national holiday or Jewish holiday on which the conduct of business is prohibited in accordance with the common practice of Orthodox Jews.

10.4   **Notices.** All notices, requests, demands and other communications given hereunder shall be in writing and shall be deemed to have been duly given: (a) on the date of delivery, if delivered personally or by messenger; or (b) on the first Business Day following the date of deposit with Federal Express or other nationally recognized overnight courier service, if sent by such courier specifying next day delivery; provided, however, that a change of address shall not be deemed to have been given until actually received by the addressee. All such notices, requests, demands and other communications shall be directed to the address first set forth above or to such other address as either party hereto may designate to the other party hereto by like notice.

10.5   **Entire Agreement.** This Agreement constitutes the entire agreement of the Members and their respective affiliates relating to the Company with respect to the subject matter hereof and supersedes all prior contracts or agreements of the Members and the Manager and their affiliates relating to the Company with respect to the subject matter hereof, whether oral or written.

10.6   **Effect of Waiver or Consent.** A waiver or consent, express or implied, to or of any breach or default by any party in the performance by that party of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that party of the same or any other obligations of that party with respect to the Company. Failure on the part of a party to complain of any act of any party or to declare any party in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that party of its rights with respect to that default until the applicable statute of limitations period has run.

10.7   **Amendment.** This Agreement may only be amended by written agreement signed by the Manager. Members' consent to an amendment of this Agreement shall only be required for an amendment which (a) directly modifies the provisions of this Agreement

-14-

governing contributions from or distributions to the Members , (b) expands the rights of the Manager or (c) imposes new obligations on a Member (as opposed to the Company) which are not otherwise provided for in this Agreement.

10.8   **Binding Effect.**  Subject to the restrictions on transfers of interest set forth in this Agreement, this Agreement is binding on and shall inure to the benefit of the Members, the Manager and their respective heirs, legal representatives, successors and assigns but shall not be deemed for the benefit of any other party.

10.9   **Further Assurances.**  In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and those transactions.

10.10   *Counterparts.*  This Agreement may be executed in multiple counterparts with the same effect as if all signing parties had signed the same document.  All counterparts shall be construed together and constitute the same instrument.

10.11   **Governing Law; Severability.**  This Agreement is governed by and shall be construed in accordance with the law of the State of Delaware, excluding any conflict-of-laws rule or principle that might refer the governance or the construction of this Agreement to the law of another jurisdiction.  In the event of a direct conflict between the provisions of this Agreement and any provision of any mandatory provision of law, the applicable provision of such law shall control.   If any provision of this Agreement or the application thereof to any party or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other parties or circumstances is not affected thereby and that provision shall be enforced to the greatest extent permitted by law.

10.12   **Consent to Jurisdiction.**  Each Member and Manager irrevocably submits to the nonexclusive jurisdiction of the United States District Court for the State of New York and the state courts of the State of New York for the purposes of any suit, action or other proceeding arising out of this Agreement or any transaction contemplated hereby.  Each Member and Manager irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement or the transactions contemplated hereby in the United States District Court for the State of New York or the state courts of the State of New York and hereby irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in such court has been brought in an inconvenient forum.

10.13   **No Broker.**  Each of the Members and Manager hereto represents and warrants to the other that there are no brokerage commissions or finders fees (or any basis therefor) resulting from any action taken by such Member or Manager or any party acting or purporting to act on such Member's or Manager's behalf upon entering into this Agreement. Each Member and Manager agrees to indemnify and hold harmless the other Member and Manager for all costs, damages or other expenses (including without limitation reasonable attorneys' fees) arising out of a breach of the representation and warranty made in this Section.

-15-

## ARTICLE XI

## SPECIAL PURPOSE ENTITY PROVISIONS

11.1    **Limitations on the Company's Activities.**

11.1.1  So long as the Indebtedness (as defined in Section 11.1.2(b) below) is outstanding, this Section 11.1 shall govern the activities of the Company notwithstanding any other provision of this Agreement. If there is a conflict between a provision of this Section 11.1 and any other provision of this Agreement, the provisions of this Section 11.1 shall govern.

11.1.2  Notwithstanding any other provision of this Agreement and any provision of law that otherwise so empowers the Company, so long as any Indebtedness (as defined in Section 11.1.2(b)) is outstanding, the Company shall not nor shall the Members cause the Company, to take or consent to any of the following actions:

(a)    make any loans to any third party, including the Members or its Affiliates (as defined at the end of this Section 11.1.2.);

(b)    except as permitted in writing or under the terms of the loan documents (the *"Loan Documents"*) securing and evidencing the mezzanine loan (the *"Indebtedness"*) from Principal Commercial Acceptance, LLC or its successors or assigns (the *"Lender"*), sell, encumber (except with respect to the Lender) or otherwise dispose of all or substantially all of the properties of the Company (a sale, encumbrance or disposition will be deemed to be "all or substantially all of the properties of the Company" if the sale or disposition includes the entire Real Estate or if the total value of the properties sold, encumbered or disposed of in such transaction and during the twelve months preceding such transaction is 66-2/3% or more in value of the Company's total assets as of the end of the most recently completed Company fiscal year);

(c)    dissolve, wind-up, or liquidate the Company;

(d)    merge, consolidate or acquire substantially all the assets of another person or entity;

(e)    change the nature of the business conducted by the Company; or

(f)    except as permitted by the Lender in writing, amend or modify this Section 11.1.

For purposes of this Agreement, Affiliate means any person or entity which directly or indirectly through one or more intermediaries controls, is controlled by or is under common control with a Members. For purposes hereof, the terms "control", "controlled", or "controlling" shall include, without limitation, (i) the ownership, control or power to vote ten percent (10%) or more of (x) the Members or (y) the Company or beneficial interests of any such person or entity, as the case may be, directly or indirectly, or acting through one or more persons or entities, (ii) the control in any manner over the Members or the election of more than one director, trustee or manager (or

persons exercising similar functions) of such person or entity, or (iii) the power to exercise, directly or indirectly, control over the management or policies of such person or entity.

11.1.3 All funds of the Company shall be deposited in such checking accounts, savings accounts, time deposits, or certificates of deposit in the Company's name or shall be invested in the Company's name, in such manner as shall be designated by the Members from time to time. Company funds shall not be commingled with those of any other person or entity. Company funds shall be used by the Members only for the business of the Company.

11.1.4 The Company shall have no indebtedness, secured or unsecured, direct or contingent, other than (x) the Indebtedness and (y) trade payables or accrued expenses (not exceeding four (4%) percent in the aggregate of the original principal amount of the Indebtedness and all such sums shall be promptly paid by the Company but in no event later than one hundred eighty (180) days of the date incurred) in the ordinary course of business, and it shall not pledge or encumber any of its assets other than in connection with the Indebtedness.

11.1.5 The Company shall not, without the affirmative vote of one hundred (100%) percent of the Members, institute proceedings to be adjudicated bankrupt or insolvent; or consent to the institution of bankruptcy or insolvency proceedings against it; or file a petition seeking, or consent to, reorganization or relief under any applicable federal or state law relating to bankruptcy; or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of the Company or a substantial part of its property; or make any assignment for the benefit of creditors; or admit in writing its inability to pay its debts generally as they become due; or take any action in furtherance of any such action.

11.1.6 The Company shall not terminate solely as a consequence of the bankruptcy, insolvency, appointment of a receiver, liquidator, assignee, trustee or sequestrator (or other similar official) of a member of the Company or a substantial part of such member's property, or assignment for the benefit of its creditors, or an admission in writing of the inability to pay its debts generally as they become due, or any similar action, of one or more of the members, so long as there remains a solvent manager of the Company.

11.1.7 The Company shall at all times observe the applicable legal requirements for the recognition of the Company as a legal entity separate from the Members and its Affiliates, including, without limitation, as follows:

(a)     The Company shall use its own separate stationary, invoices and checks.

(b)     The Company shall maintain its records and books and accounts separate from those of any Affiliate or any other entity. The Company shall prepare unaudited quarterly and annual financial statements, and the Company's financial statements shall substantially comply with generally accepted accounting principles ("GAAP").

(c)     The Company shall establish and maintain an office through which its business will be conducted separate and apart from those of its Affiliates or shall allocate fairly and reasonably any overhead and expense for shared office space.

-17-

(d)      The Company shall maintain its own separate bank accounts, payroll and correct, complete and separate books of account.

(e)      The Company shall hold itself out to the public (including any Affiliate's creditors) under the Company's own name and as a separate and distinct entity and not as a department, division or otherwise of any Affiliate.

(f)      All customary formalities regarding the existence of the Company, including holding meetings and maintaining current and accurate minute books separate from those of any Affiliate, shall be observed.

(g)      The Company shall act solely in its own name and through its own duly authorized officers and agents. No Affiliate shall be appointed or act as agent of the Company (except for services rendered under a management agreement with an Affiliate so long as the manager, or an equivalent thereof, holds itself out as an agent of the Company).

(h)      Investments shall be made in the name of the Company directly by the Company or on its behalf by brokers engaged and paid by the Company or its agents.

(i)      The Company shall not guarantee or assume any liabilities or obligations for the benefit of any party, including, without limitation, any Affiliate or hold itself out or permit itself to be held out as having guaranteed or assumed any liabilities or obligations of any party, including, without limitation, any Members or any Affiliate, nor shall it make any loan to any party (including any Affiliate).

(j)      The Company is and will be solvent and shall pay its own liabilities, indebtedness and obligations of any kind, including all administrative expenses, from its own separate assets.

(k)      Assets of the Company shall be separately identified, maintained and segregated. The Company's assets shall at all times be held by or on behalf of the Company and if held on behalf of the Company by another entity, shall at all times be kept identifiable (in accordance with customary usages) as assets owned by the Company. This restriction requires, among other things, that Company funds shall not be commingled with those of any Affiliate and it shall maintain all accounts in its own name and with its own tax identification number, separate from those of any Affiliate.

(l)      The Company shall not take any action if, as a result of such action, the Company would be required to register as an investment company under the Investment Company Act of 1940, as amended.

(m)      All data and records (including computer records) used by the Company or any Affiliate in the collection and administration of any loan shall reflect the Company's ownership interest therein.

(n)      None of the Company's funds shall be invested in securities issued by any Affiliate.

-18-

118427.00410/6347763v9

(o)     The Company shall not enter into any contract or agreement with any employee, shareholder, consultant, agent, director, partner, member or manager of the Company or any Affiliate, as applicable, except upon terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arms-length basis with third parties other than an Affiliate.

(p)     The Company shall file its own tax returns.

(q)     The Company shall not do any act which would make it impossible to carry on the ordinary business of the Company.

(r)     The Company shall not hold title to the Company's assets other than in the Company's name.

Any of the foregoing covenants shall not affect the status of the Company as a separate legal entity or the limited liability of the Members.

*[signatures on next page]*

-19-

IN WITNESS WHEREOF, this Agreement is adopted as of _August 26_

2004.

MANAGER:

Benjamin Ringel

MEMBERS:
AC RETAIL FUND I LLC

By:
    Benjamin Ringel, member

JACK AND MIRIAM BASCH FOUNDATION

By:
    Name:
    Title:

USHER AND MIRIAM MEISELS FAMILY
FOUNDATION

By:
    Name:
    Title:

_____
Tibor Klein

_____
Gershon Klein

_____
Chana Ringel

_____
Michael Krull

-20-

118427.00410/5347763v9

IN WITNESS WHEREOF, this Agreement is adopted as of _August 26_,
2004.

MANAGER:

Benjamin Ringel

MEMBERS:
AC RETAIL FUND I LLC

By:
     Benjamin Ringel, member

JACK AND MIRIAM BASCH FOUNDATION,

By:
     Name:
     Title:

USHER AND MIRIAM MIISBLS FAMILY
FOUNDATION

By:
     Name:
     Title:

Tibor Klein

Gordon Klein

Chaim Ringel

Michael Krull

-20-

08/25/04  WED 18:50 FAX 212 885 5000          BLANK ROME LLP                    ☑045

IN WITNESS WHEREOF, this Agreement is adopted as of _August 26_
2004.

MANAGER:

Benjamin Ringel

MEMBERS:
AU RETAIL FUND I LLC

By:_____
      Benjamin Ringel, member

JACK AND MIRIAM BASCH FOUNDATION

By:_____
      Name:
      Title:

USHER AND MIRIAM MEISELS FAMILY
FOUNDATION

By:_____
      Name:
      Title:

Tibor Klein

Gershon Klein

Chana Ringel

Michael Krull

-20-

1184J7.0041.0/03M77487w9

08/25/04  WED 16:58 FAX 212 888 5063        BLANK ROME LLP                        ☐041

IN WITNESS WHEREOF, this Agreement is adopted as of _August 26_

2004.

MANAGER:

Benjamin Ringel

MEMBERS:
AC RETAIL FUND I LLC

By:
   Benjamin Ringel, member

JACK AND MIRIAM BASCH FOUNDATION

By:
   Name:
   Title:

USHER AND MIRIAM MEISELS FAMILY
FOUNDATION

By:
   Name:
   Title:

_Tibor Klein_
Tibor Klein

Gershon Klein

Chana Ringel

Michael Krull

-20-

118427.00410/5347763v9